## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SAY IT VISUALLY, INC. D/B/A FAST
FORWARD STORIES.,

        Plaintiff,

      v.

REAL ESTATE EDUCATION COMPANY,
INC., D/B/A REAL ESTATE ACADEMY,
MIGDAL LAW, P.C., AND ALLAN T.
MIGDAL,

        Defendants.

No. 23 CV 3424

Judge Georgia N. Alexakis

### MEMORANDUM OPINION AND ORDER

Plaintiff Say It Visually, Inc., alleges that defendants, Real Estate Education Company, Inc., Migdal Law, P.C., and Allan T. Midgal, infringed its copyrights and violated the Digital Millenium Copyright Act, 17 U.S.C. §§ 1201(a), 1202(b), by using its real-estate explainer videos without authorization.

Before the Court addresses any alleged infringement, though, it must address defendants' motion for sanctions. Defendants allege that Matthew Dunn, plaintiff's sole owner, repeatedly perjured himself when he claimed that he singlehandedly authored the scripts of all 100 works at issue in this litigation. According to defendants, the scripts for many of these works were copied, either word-for-word or with exceedingly minor differences, from other online sources, and Dunn admitted as much only after he swore otherwise in written interrogatory responses and only after extensive questioning in a deposition. Because of the persistent nature of Dunn's lies

and because they bore on a key issue in this case—the validity of the asserted copyrights—defendants seek dismissal of this lawsuit with prejudice as a sanction.

For the reasons that follow, the Court finds that Dunn committed perjury and concludes that dismissal of this matter with prejudice is the only appropriate and effective sanction. Defendants' motion for sanctions is therefore granted. [83]. The remaining pending motions—plaintiff's motions for partial summary judgment and Rule 37(e) sanctions and defendants' motions for summary judgment and to withdraw an admission [86]—are denied as moot. [73], [76], [78], [86].

## I. Factual Background

### A. The Complaint

Plaintiff Say It Visually, Inc., which does business as Fast Forward Stories ("FFS"), creates and licenses "explainer" videos—short, one-to-two-minute animated and narrated videos explaining various industries' terms or practices. [1] ¶ 8. The 100 videos (or "works in suit") at issue all relate to real estate, covering concepts from adjustable-rate mortgages to interest locks to real estate closings. *Id.*

In its complaint, plaintiff claims that it is the "author" of each work in suit and the "sole owner" of the corresponding copyrights, and that each work in suit is an "original creation," "not copied from the works of others," and a "wholly original expression[]." *Id.* ¶¶ 11–13. Plaintiff registered copyrights in each work in suit with the United States Copyright Office. *Id.* ¶ 14. Plaintiff alleges that defendants distributed the works in suit and removed its copyright management information from each one without permission. *Id.* ¶¶ 28–44.

2

### B. Plaintiff's Sworn Responses to Interrogatories

Plaintiff's sole owner is Matthew Dunn. [85-1] at 7.[1] In September 2023, Dunn answered 30 interrogatories on plaintiff's behalf under penalty of perjury. *Id.* Dunn's responses to two interrogatories are relevant to this motion.

In Interrogatory No. 15, defendants asked plaintiff to "[d]escribe the process of creating the Work in Suit." *Id.* at 4. Dunn answered, in relevant part:

> The process of creating the works in suit was typically started by researching the list of frequently asked questions – 'FAQs' — across business and government websites in the subject areas. Where answered, FAQs were read. Otherwise, additional research for substantive, authoritative answers on the topic were pursued through online resources. Typically the screenwriter (Dr. Dunn) would read numerous articles on a topic to understand the key concepts and relationships involved.

> With research in hand, a screenplay was developed, drawing on experience creating 'explainer' videos for hire. The expertise in screen writing, narrative and visual design was drawn in part from the screenwriter's Master of Fine Arts in Directing (The University of Texas at Austin, 1987), and from dozens of Say It Visually custom explainer-video projects for Fortune 100 and other companies from 2009 - 2013.

> Explainer video scripts require strict attention to time and tempo to accommodate attention spans; conscious decisions about what should be <u>said</u> and what should be <u>shown</u>, and the time required for each, are integral to design. Likewise, while the topics of these videos are relatively dry and abstract, a narrative arc with people <u>involved</u> in the topic is part of the design.

*Id.* at 4–5 (emphases in original). In other words, Dunn emphasized the originality of his scripts.

Dunn's response continued:

Animation and artwork were designed to clarify the subject of each

---

[1] The page numbers noted in [85-1] correspond to those in the heading of each page.

video, and to accompany the voiceover. Hundreds to thousands of individual graphics were incorporated, some from licensed "clip art" collections, and many custom-designed to illustrate key concepts. For example, the visual representing principal and interest payments with a dump track in #072 depicts the principle-to-interest ratio with an accurate curve. Nearly every scene involves human characters reacting to the sequence of events to enhance psychological engagement with relatively dry and detailed terminology.

*Id.* at 5.

In Interrogatory No. 16, defendants asked plaintiff to "[l]ist all the people or companies that helped or assisted [it] in any way in the creation and distribution of the Work in Suit." *Id.* at 6. In response, Dunn identified only the following individuals: himself; two of plaintiff's former employees, who performed artwork, design, and animation, and occasionally assisted with order fulfillment; a video-hosting service; and two licensed partners that assisted in distribution. *Id.*

### C. Plaintiff's Document Production

Following plaintiff's initial document production, defendants independently discovered that the works in suit used off-the-shelf character animation provided by a company called Powtoon. [84] at 4. Defendants included this material in their second set of requests for admission, and in response, plaintiff admitted that the characters were not its original artwork. *See* [85-1] at 14–44.

Around the same time, plaintiff produced scripts for 91 of the works in suit. *Id.* at 56–85. In the header of each page, plaintiff wrote: "sayitvisually.com," and in the footer: "© 2013 Say It Visually, Inc. All Rights Reserved." In other words, although plaintiff now admitted that the artwork in the works in suit was not wholly original—contrary to Dunn's earlier sworn interrogatory response—plaintiff still claimed that

its scripts were original creations.

### D. Dunn's Deposition Testimony

Dunn was deposed twice in this ligation. In his first deposition, Dunn testified both in his individual capacity and as plaintiff's designated representative under Rule 30(b)(6). [85-1] at 91. In his second deposition, Dunn testified as an expert. *Id.* at 150–51. Both times, of course, Dunn testified under oath. *Id.* at 91, 150.

The night before Dunn's first deposition, defendants' counsel discovered websites—published before plaintiff's videos—with language that mirrored, in many cases word-for-word, several of the scripts of the works in suit. [81] ¶ 10; [118] at 8 n.1; *see also* [84-1] and [84-2] (charts prepared by defendants comparing the scripts of plaintiff's videos to internet materials predating those scripts).

During Dunn's first deposition, defendants' counsel asked Dunn to generally describe the process of creating the works in suit. [85-1] at 92. In his two-minute answer, Dunn described this process as starting with "a tremendous amount of reading and research … a lot of digestion, a lot of trying to internalize what is this, how does it work, how can we potentially help someone understand it." *Id.* According to Dunn, this "research" spanned FAQs, realtor sites, broker sites, and government information—including information from the Department of Housing and Urban Development ("HUD"). *Id.* Next, Dunn described the "critical" step of "distilling that [research] down to a script … Lots of writing, lots of rewriting, lots of editing and throwing things out." *Id.*; *see also id.* ("I wrote the scripts usually in bursts and chunks.").

A bit later in the deposition, defendants' counsel asked Dunn whether plaintiff, Say It Visually, claims a copyright in the scripts themselves. *Id.* at 95. Dunn answered: "Absolutely." *Id.* Dunn explained that he put a copyright notice on the scripts "[b]ecause it's a lot of the work and a lot of creativity compressed into text." *Id.* Counsel then asked Dunn to describe his research for the scripts in more detail. *Id.* During the subsequent two-minute exchange, Dunn testified that the research involved

> reading any and every source that I could find to make sense of a topic … So I would read articles, dictionary entries, web page FAQs, government documents and try to get my hands around the conceptual logic of what — what's loan-to-value ratio. And then boil that down into 150 words or less with the kind of cadence and terminology that I think works in voiceover.

*Id.*

At this point in the deposition, defendants' counsel furnished Dunn with a copy of the complaint. *Id.* at 96. Dunn testified that he provided information for the complaint, reviewed it before it was filed, and confirmed that everything in the complaint was true and accurate, to the best of his knowledge. *Id.* Counsel asked Dunn whether there was anything copied from the works of others, aside from the clip art, character artwork, and music. *Id.* Dunn responded, "I don't think so." *Id.* Counsel also showed Dunn his responses to the interrogatories and confirmed that Dunn helped prepare those responses and signed them under penalty of perjury. *Id.* at 97. Dunn described his response to Interrogatory No. 15—which detailed his research and authorship of the scripts—as "accurate." *Id.*

Following this lengthy prelude, defendants' counsel opened the Wayback

Machine, which (in Dunn's words) "is a partial archive of web—websites and web pages." *Id.* at 98. Counsel pulled up an FAQ webpage from "Sarasota Real Estate," which the Wayback Machine showed had been archived on October 10, 2002. *Id.* At this point in the deposition, Dunn began to laugh, saying "someone copied my script." *Id.* at 99. Counsel asked Dunn to read select text from that 2002 FAQ. *Id.* Counsel then played Video 27 of the works in suit. *Id.* Dunn acknowledged that the text from the 2002 FAQs was "the same" as Video 27's script, and that 2002 was more than 10 years before he published any of the works in suit. *Id.* at 100. Yet when pressed for an explanation as to "why the script of [his] video is identical to a real estate FAQ from a website published … 11 years before [the] video," Dunn first testified that he had no explanation. *Id.* A moment later he expressed doubt in the accuracy or authenticity of the Wayback Machine because, Dunn maintained, "I remember writing" Video 27's script. *Id.* Squarely asked whether it was Dunn's position that he "did not copy the script for Video 27 from an Internet FAQ," Dunn responded: "That's my position." *Id.*

Defendants' counsel repeated this process—pulling up the 2002 FAQ and then playing the identical script of Dunn's videos—for four more works in suit: Videos 28, 29, 30, and 31.[2] *Id.* at 100–02. In each iteration, Dunn maintained that he wrote the video's script himself; did not copy it from the 2002 FAQ; and believed the Wayback Machine to be wrong because he had a personal memory of writing the script. *Id.* After this exercise, counsel again asked Dunn whether he still maintained that he

---

[2] Video 31 omitted one phrase from the 2002 FAQ. [85-1] at 101. Video 30 changed "lender" to "lenders" and omitted the phrase "et cetera." *Id.* at 102.

wrote the scripts for all five videos himself. *Id.* at 103. Dunn answered yes. *Id.* When counsel asked Dunn how the five scripts could have appeared on a website archived 11 years before their creation, Dunn offered two explanations:

> As I said about research, FAQs were one of the sources. I've been accused of having a photographic memory. That or a Wayback Machine error are the only two explanations I can think of at the moment.

*Id.*

Defendants' counsel moved on to show Dunn text from a different archived webpage—a 2012 Coldwell Banker Real Estate FAQ—and asked Dunn to compare that text with the scripts from two more works in suit: Videos 36 and 38. *Id.* at 103–04. Dunn again acknowledged that his scripts were almost identical to the 2012 FAQ, maintained the "same explanation as before," and still claimed to have written all the scripts for the videos himself even though the 2012 FAQ predated the works in suit by at least one year. *Id.* at 104. By this point, over 33 minutes (or approximately 23 transcript pages) had elapsed since defendants' counsel began his line of questions using the archived webpages.

Next, defendants' counsel pulled up a HUD consumer guide that had been archived in 2006, about seven and half years before plaintiff published any of the works in suit. *Id.* at 105. When counsel asked Dunn if he had ever seen the HUD webpage, Dunn answered: "Not that I recall." *Id.* Dunn read a portion of the HUD guide, and counsel played another work in suit (Video 110). *Id.* This process—reading the HUD guide, playing portions of plaintiff's video, and having Dunn confirm that the text from the guide and the video's script were nearly, if not completely,

8

identical—went on for approximately eight minutes. *Id.* at 105–06. At the end of this exercise, when counsel asked Dunn if he had an explanation for the almost verbatim text, Dunn said that he did. *Id.* at 106. This time, rather than faulting the Wayback Machine or crediting his "photographic memory," Dunn explained that "[w]e used HUD's FAQ page heavily in researching, and that page and the contents of it are public domain." *Id.*

At this point—45 minutes (or approximately 32 transcript pages) after the relevant line of questions began—Dunn affirmed that he had claimed copyright protection in the works in suits' scripts and had represented "multiple times in this deposition" that those scripts were his own original work. *Id.* at 106–07. Dunn then conceded that the scripts "were essentially copied from [HUD] document questions"; that his earlier testimony that he wrote the scripts himself was incorrect; that "the bulk of the text [of the scripts] was from the HUD page"; that some of the scripts were identical to the HUD page; that it is not correct that he wrote the scripts himself; and that his interrogatory responses, verified under penalty of perjury, were wrong. *Id.* When counsel asked Dunn if he was "confirming under oath today that those responses that you gave before and verified under penalty of perjury were incorrect," Dunn responded: "My recollection was not the same." *Id.* at 107.

Following Dunn's first deposition, defendants' counsel asked plaintiff's counsel to produce the pre-existing FAQs, including the HUD materials, upon which Dunn claimed to have relied when writing the scripts of the works in suit. [85] ¶ 11. When defendants filed the instant motion seeking sanctions several months later, plaintiff

had not produced the requested materials. *Id.*[3]

Dunn sat for his second deposition, this time as an expert witness, two months after his first one. *See generally* [85-1] at Ex. 8. During that deposition, defendants' counsel and Dunn engaged in the below exchange:

> Q. And we also covered, at the last deposition, that for a large number of the videos in question, including the one we just watched, essentially all the black-and-white videos, the scripts were copied in their entirety from a [HUD] document?
>
> A: No.

*Id.* at 152. Plaintiff's counsel objected to the question's form. Dunn continued: "[Y]ou said 'a large number.' That's not accurate." *Id.* When defense counsel asked why his characterization was inaccurate, the following exchange took place:

---

[3] After defendants filed their motion for sanctions, Dunn provided a sworn affidavit supporting plaintiff's opposition to defendants' motion for summary judgment [99-1], in which he discussed documents from the Federal Home Administration ("FHA"), an agency within HUD. *See United States v. Gaudin*, 515 U.S. 506, 508 (1995). In relevant part, Dunn's affidavit—which relied on the Wayback Machine, the accuracy of which he previously doubted—read as follows:

> During this litigation, FFS has not had a copy of the Federal Home Administration ("FHA") documents that I recall using for some of the works in suit and that were discussed at my deposition. I have subsequently researched the matter, and have located copies of them online, at the following URL: https://web.archive.org/web/20130901235037/http://portal.hud.gov/hudportal/HUD?src=/ program_offices/housing/sfh/buying/buyhm.
>
> The document at this URL is a copy of the public domain FHA document I would have used.

[99-1] ¶ 4. In responding to defendants' motion for sanctions, plaintiff does not address how this declaration supports plaintiff's argument that Dunn did not commit perjury or that sanctions are not warranted. Even if it had, the statement is of limited value: Dunn does not concede that he, in fact, lifted language from the FHA documents, stating only that he "would have used" those materials. Moreover, as the Court explains later in this opinion, the belated nature of the admission—like the belated nature of Dunn's ultimate concessions in his first deposition—does not forestall dismissal as a sanction.

A:      Because the count is not even a quarter of Fast Forward's total output, the count of scripts. This is what you're working in here, the count of scripts that were federal FAQs. Twenty of those scripts are specifically federal topics. The remaining 21 or 22 were more generic real estate topics. But that total, 40-odd, out of the over 250 that we have created, is not a large number.

Q:      … Is it your testimony that only 20 or only 40 of the 150 real estate videos came from that FAQ?

A:      Since that's not what this expert report is about, I'm going to do this from memory. The approximate count of FFS videos that used the federal public domain FAQs as scripts was in the 40s out of our total of over 250.

*Id.* And then, later:

Q:      … Incidentally, did you ever find that [HUD] document from which those scripts were drawn?

A:      No.

Q:      But getting back to the point of the expert report, the fact is, you were able to create videos that were just reading into a video an FAQ that you got from the public domain, right?

A:      Your specific statement is a little offensive. One, we identified that it's a minor number of the videos. So don't make a broad-brush statement about that's all I did. Two, there's more to it than just reading the script and clicking a magic button on Powtoon.

Q:      For the purpose of coming up with the script, though – we're talking about the script section – for those 40-some videos that you've acknowledged came from the FAQ, the script writing part consisted entirely of copying those FAQs, correct?

A:      And for the balance that weren't from those FAQs, writing them, correct.

Q:      … But you can create a video … where the script is just reading in an FAQ from the public domain? That's what you did for 40-some of the videos, for the scripts for those videos, right?

A:      Would you restate that question, please.

11

Q:    You can create an explainer video where the script is just a copied public domain FAQ because that's what you did for about 40 of these videos, right?

A:    Yes, you can do that.

*Id.* at 153.

### E. The Parties' Subsequent Motion Practice

Beginning two months after Dunn's second deposition, the parties engaged in substantial motion practice. In addition to their motion for sanctions, defendants moved for summary judgment and sought to withdraw an admission (made when defendants were unrepresented by counsel and before Dunn's depositions) that defendants lacked "evidence that FFS is not the owner of the valid copyright" for each work in suit. *See generally* [78], [86].

Plaintiff opposed defendants' motions, moved for partial summary judgment against defendants [73], and separately sought sanctions against defendants (in the form of attorneys' fees, costs, and an adverse inference instruction) for allegedly destroying electronically stored information [76]. In an affidavit attached to plaintiff's motion for partial summary judgment, Dunn made the following declarations in connection with his deposition testimony about Dunn's reliance on HUD documents when generating scripts for the works in suit:

24.    Defendants' counsel also pointed out that contrary to my recollection regarding works I created about ten years ago, the scripts for a few of the videos were taken from public domain Federal Housing [Administration] ("FHA") documents, instead of being written by me in my normal fashion. *This too was an oversight and a failing of my memory.* I have produced over 300 videos over the past 15 years and have written scripts for almost

all of them, and *I simply forgot* that the scripts for those few videos — those primarily on government topics — came from FHA documents.

25.     In May of this year [2024], I filed Correction Applications with the Copyright Office for 23 of the works in suit, in which I advised the Copyright Office of the failure to exclude the music and/or script from the indicated copyright applications, and requested a supplemental registration correcting those inaccuracies.[4] An example of such Correction Applications is attached as Exhibit 102.[5] As of today, the Copyright Office has issued supplemental registrations on 21 of them, and based on my past experience with the Copyright Office I expect the remaining ones will issue shortly.[6]

[75-1] ¶¶ 24–25 (emphases added).

In their motion for sanctions, defendants asserted that, following Dunn's testimony and shortly before filing the motion, they discovered additional materials on the website Realtor.com that "appear to be the source" of additional video scripts, as the scripts "clearly lift much of the language and content from the Realtor.com articles." [84] at 10. Defendants attached to their memorandum two appendices comparing scripts of plaintiff's videos to internet materials predating those scripts, including the materials from Realtor.com. *See* [84-1], [84-2]. The main takeaway from these charts is that the specified video scripts are near carbon copies of earlier available internet material.

---

4  A supplementary registration may be used to "correct an error in a copyright registration or to amplify the information given in a registration." 17 U.S.C. § 408(d). The supplementary registration augments, but does not supersede, the basic registration. 17 U.S.C. § 408(d).

5  The "Amplification Explanation" in this Correction Application reads: "Music and script inadvertently included in original application." [75-9] at 20.

6  Since submitting his affidavit, plaintiff has not alerted the Court to any additional supplemental registrations from the Copyright Office.

In opposing sanctions, plaintiff did not dispute the accuracy of these comparison charts and offered no explanation for the similarities between its scripts and the Realtor.com materials. *See generally* [102]. In total, defendants allege that 47 of the 100 scripts are outright copied and further allege that eight additional scripts are "heavily derived" from other sources. [84] at 1; [84-1], [84-2].

## II.     Relevant Legal Principles

### A. Perjury

Perjury is (1) false testimony about a (2) material matter that is (3) made willfully. *United States v. Savage*, 505 F.3d 754, 762 (7th Cir. 2007). Courts can sanction parties that engage in perjury, including by dismissing an action. *See Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false.") (cleaned up).

False testimony must be made under oath or affirmation. *Vander Pas v. Bd. of Regents of Univ. of Wisconsin Sys.*, 664 F. Supp. 3d 893, 907 (E.D. Wis. 2023). Providing "[k]nowingly incomplete and misleading answers to written interrogatories" can satisfy this element. *See Dotson v. Bravo*, 202 F.R.D. 559, 567 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003). To be material, a false statement must have a "natural tendency to influence" or be "capable of influencing" the decisionmaker to whom it is addressed. *Alexander v. Caraustar Indus., Inc.,* 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013). The statement must be material when made but need not affect any resulting decision. *Id; accord United States v. Grigsby*, 692 F.3d

778, 785 (7th Cir. 2012).

False testimony given because of confusion, mistake, or faulty memory is not perjury. *United States v. Bermea-Boone*, 563 F.3d 621, 627 (7th Cir. 2009); *see also Grigsby*, 692 F.3d at 785. But false testimony given willfully is. *Bermea-Boone*, 563 F.3d at 627. Discrepancies in testimony alone do not amount to willfully false testimony. *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008). The discrepancies must be paired with evidence of the witness's intent to give false testimony. *Id*. at 566. For example, the witness might provide "elaborate, detailed and deliberate mistruths concerning material facts," *Bermea–Boone,* 563 F.3d at 626–27; demonstrate a pattern of lying or other misconduct, *Dotson*, 202 F.R.D. at 575; or otherwise show bad faith or fault, *Downs v. Westphal*, 78 F.3d 1252, 1256–57 (7th Cir. 1996). Courts may employ "[c]ommon sense and human experience" to distinguish between inadvertent discrepancies and false testimony given willfully. *Alexander,* 930 F. Supp. 2d at 952, 959.

### B. Copyright Law

Plaintiff's complaint includes three counts: one for copyright infringement under 17 U.S.C. § 501, [1] ¶¶ 49–61, and two for violations of the Digital Millenium Copyright Act, 17 U.S.C. §§ 1201(a), 1202(b), *id.* ¶¶ 62–72, 73–84. To establish copyright infringement for all three counts, plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 886 (7th Cir. 2021).

"A certificate of registration from the U.S. Register of Copyrights constitutes

prima facie evidence of the validity of a copyright." *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). However, this is a rebuttable presumption: A plaintiff "cannot satisfy this precondition by duping the Copyright Office into issuing a certificate of registration based on a false claim of copyright ownership." *See Mid Am. Title Co. v. Kirk,* 59 F.3d 719, 721 (7th Cir. 1995); *DeliverMed Holdings, LLC v. Schaltenbrand,* 734 F.3d 616, 622 (7th Cir. 2013).

To prevent the Copyright Office from being so "duped," the Copyright Act provides for the invalidation of copyright registrations obtained by knowing misrepresentations of material fact (fraud, in other words). *See DeliverMed,* 734 F.3d at 622. Under 17 U.S.C. § 411(b), a copyright registration cannot support an infringement action if (1) the registrant included inaccurate information on the application with knowledge that it was inaccurate,[7] and (2) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration. *DeliverMed,* 734 F.3d at 622 (quoting § 411(b)).

The Seventh Circuit provides a process for district courts to follow when presented with allegations of copyright fraud under § 411(b). *Id.* The district court can demand that the party moving for invalidation establish two preconditions: (1) that the registration application included inaccurate information, and (2) that the

---

[7] "[T]he word 'knowledge' means actual, subjective awareness of both the facts and the law." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,* 595 U.S. 178, 186 (2022). "[W]illful blindness may support a finding of actual knowledge" within the meaning of § 411(b)(1)(A). *Id.* at 187. "Circumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters, may also lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information." *Id.*

registrant knowingly included the inaccuracy in his submission to the Copyright Office.[8] *DeliverMed,* 734 F.3d at 625. Once the district court is satisfied that the movant has met these preconditions, the next question is whether this inaccurate information would have caused the Register of Copyrights to refuse registration. 17 U.S.C. § 411(b)(1)(B). But the district court does not answer this question—the Register of Copyrights does. 17 U.S.C. § 411(b)(2); *DeliverMed,* 734 F.3d at 626. As *DeliverMed* explained: "Aside from minimizing the risk that parties would use this provision as a delay tactic, this approach has the added benefit of an endorsement from the Register." 734 F.3d at 626; *see also id.* at 623 (explaining the obligatory nature of the referral).

### III. Analysis

#### A. Dunn Committed Perjury.

Defendants argue that Dunn perjured himself by falsely claiming to be the original author of the scripts of the works in suit. [84] at 11. Plaintiff disputes that

---

[8] The Seventh Circuit does not explicitly *require* that a party challenging a copyright's validity make this showing: Rather, the appeals court allows that "courts *can* demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." *DeliverMed,* 734 F.3d at 625 (emphasis added). A Wisconsin district court understood *DeliverMed* to mean that a court should "consider whether [the movant] put forth factual material that tends to support that [the registrant] knowingly included inaccurate information on its registrations." *PalatiumCare, Inc. v. Notify LLC*, No. 22-CV-217-JPS-JPS, 2023 WL 2929462, at *2 (E.D. Wis. Apr. 11, 2023).

Dunn's false testimony constituted perjury. *See generally* [102].⁹

Defendants also argue that Dunn perjured himself by failing to initially admit that he used animation provided by Powtoon to create the works in suit. *Id.* at 1. However, unlike Dunn's false testimony concerning the scripts, defendants discovered this omission relatively early in the litigation, *id.* at 4–5, and defendants do not otherwise allege that it materially affected their ability to conduct discovery or mount a defense in this litigation. The Court therefore focuses its perjury analysis on Dunn's representations regarding the originality of the scripts.

### 1. False Testimony

Dunn engaged in at least two instances of false testimony: First in his sworn responses to defendants' interrogatories, [85-1] at 7, and then in his first deposition, *id.* at 91. In both instances, he falsely testified that he authored the scripts of the works in suit. Plaintiff does not dispute that Dunn's answers were false and given under oath. *See, e.g.,* [102] at 7.

---

⁹ Plaintiff's opposition to defendants' motion for sanctions is quite anemic. [102]. Plaintiff does not once cite to the record, and instead generally refers the Court to the entirety of its response in opposition to defendants' motion to withdraw its admission. [102] at 2, 5 (citing to [100] generally). When the Court turns to what it believes is the relevant portion of [100] (beginning on page 9), it is again deprived of any citation to the record, and is instead directed to [74] (plaintiff's memorandum in support of its motion for partial summary judgment), [75] (plaintiff's statement of facts in support of its motion for summary judgment), and eventually, [99] (plaintiff's statement of additional material facts in opposition to defendants' motion for summary judgment). Though the Court has reviewed all of defendants' filings, such a scavenger hunt for facts and legal argument is not the Court's province. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

## 2. Materiality

The Court next asks whether Dunn's false testimony had a natural tendency to influence, or was capable of influencing, the decisionmaker it addressed at the time the statements were made. *Alexander,* 930 F. Supp. 2d at 957. Plaintiff argues that Dunn's false testimony is immaterial because defendants cannot establish what plaintiff calls the "critical element of a § 411(b) defense: that had the Copyright Office received the 'accurate' information, it would have refused registration of the work." [102] at 6.

But plaintiff skips a step. As § 411(b) and the Seventh Circuit in *DeliverMed* make clear, when a party challenges the validity of a copyright, that challenge does not proceed straight to the Register of Copyrights. Rather, the Court first screens the referral request. In so doing, it can require the moving party to put forth evidence indicating two things: that (1) the registration application included inaccurate information, and that (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office. *DeliverMed,* 734 F.3d at 625. If the movant satisfies these preconditions, the Court asks the Register whether this inaccurate information would have caused it to refuse registration. *Id.*; 17 U.S.C. § 411(b)(1)(B). So the Court—not the Copyright Office—is the first decisionmaker Dunn's false testimony was capable of influencing.

Dunn's false testimony concerns his authorship of the videos' scripts and his company's copyright registrations with respect to those scripts. These issues strike at the heart of both (1) whether plaintiff included inaccurate information in its

copyright registrations, and if so, (2) whether it did so knowingly. *DeliverMed,* 734 F.3d at 625. Because Dunn testified falsely, he deprived defendants of their ability to mount a § 411(b) defense and move for a referral to the Register of Copyrights and, concomitantly, deprived this Court—the decisionmaker—of information that was more than capable of influencing its resolution of such a motion. In other words, Dunn's false statements were material. *See PalatiumCare*, No. 22-CV-217-JPS-JPS, 2023 WL 2929462, at *7 (district court could not conclude, based solely on plaintiff's bare assertion, that the plaintiff's failure to indicate to the Copyright Office that its code included preexisting and/or open source code was due to a good-faith mistake of law or fact); *Art of Design, Inc. v. Pontoon Boat, LLC,* Case No. 3:16-CV-595-JD-JEM, 2019 WL 3749990, at *3 (N.D. Ind. Aug. 8, 2019) (two-prong test satisfied where the movant "presented adequate possibility of fraud").

There are several other problems underlying plaintiff's contention that Dunn's lies were not material. First, according to plaintiff, a party mounting a § 411(b) defense must make a "critical" showing that "had the Copyright Office received the 'accurate' information, it would have refused registration of the work." [102] at 6; *see also* [101] at 8 (claiming that "Defendants must show that there was **no** protected expression … in the works in suit that would have caused the Copyright Office to register them"). Plaintiff does not provide a source for the requirement that

defendants must establish this so-called "critical" element.[10] It is unlikely one exists: The Seventh Circuit and other courts are clear that it is the Register of Copyrights, not the Court, that must determine whether an inaccuracy in a copyright registration application is material. *See DeliverMed,* 734 F.3d at 624 (the Court "must request a response from the Register before coming to a conclusion as to the materiality of a particular misrepresentation"); *PalatiumCare,* No. 22-CV-217-JPS-JPS, 2023 WL 2929462, at *9 ("The Register may still, of course, find that the initial misidentification of authorship was immaterial and proceed to accept [the registrant's] supplementary registrations, but that is for the Register to decide."); *Covetrus Inc. v. Actian Corp.,* No. 2:21-CV-00097-LEW, 2022 WL 17417289, at *3 (D. Me. Dec. 2, 2022) ("In effect, Congress has made the Register an essential initial arbiter of the issue of the materiality of misrepresentations made to the Register."). Simply put: Defendants do not bear the burden plaintiff tries to assign to them.

Next, plaintiff asks the Court to assume that, because the Register of Copyrights granted Supplementary Registrations to these 23 works, it would do the same for any others where plaintiff wrongly claimed copyright in unoriginal scripts. [100] at 11; [102] at 6. But again, any question about the materiality of

---

[10] In its motion for summary judgment, plaintiff again claims that defendants must "prove … that had the Copyright Office known of the inaccuracy it would have refused registration." [74] at 6. To support this point, plaintiff cites generally to only one case: *Ty Inc. v. Target Corp.,* 629 F. Supp. 3d 834 (N.D. Ill. 2022). *Id.* at n.17. But the court in *Ty* adhered to the two-prong *DeliverMed* test. *Id.* at 838. It did not impose a third requirement that the movant "prove … that had the Copyright Office known of the inaccuracy it would have refused registration." *See id.* at 840 ("Target has not shown that Ty's application contained any inaccuracies. The court therefore need not address whether Target demonstrated that Ty had knowledge of any inaccuracies.").

misrepresentations in copyright registration applications is one that the Court would decline to answer itself and instead would refer to the Register of Copyrights. *DeliverMed,* 734 F.3d at 624.

Moreover, in pointing to the Supplementary Registrations, plaintiff appears to lose sight of what constitutes a material misrepresentation for purposes of perjury. To be material in that context, a false statement need only have a "natural tendency to influence" or be "capable of influencing" the decisionmaker; it need not actually affect any resulting decision. *See Grigsby*, 692 F.3d at 785. Plaintiff never argues that its inaccurate representations concerning Dunn's authorship of the scripts were incapable of even influencing the Register. Indeed, were that plaintiff's position, it should have seen no need to even submit its Correction Applications.

One final note: Plaintiff's materiality argument presumes that only 23 of the 100 works-in-suit contain unoriginal scripts. *See, e.g.,* [74] at 6; [100] at 11; [102] at 6. Plaintiff does not cite a source for this assumption. And Dunn never explicitly testified or affirmed that he only copied the scripts of 23 of the 100 works in suit, while authoring the rest himself. Indeed, during his second deposition, Dunn testified that some "40-odd" of plaintiff's 250 total videos were copied from other sources. *See* [85-1] at 152. The Court therefore cannot assume that plaintiff is the author of the remaining 60 or 77 scripts in the 100 works in suit. Even assuming that Dunn *only* copied the scripts of 23 of the 100 works in suit, the Court is hard-pressed to see how critically false testimony about almost a quarter of the videos at issue amounts to an immaterial matter.

### 3. Willfulness

Dunn's materially false statements were willfully made. As noted earlier, inconsistencies in testimony alone do not support an inference of intent to testify falsely. *See Montano*, 535 F.3d at 566. But here, Dunn did more than testify inconsistently with the truth. He provided "elaborate, detailed and deliberate mistruths concerning material facts," *Bermea–Boone,* 563 F.3d at 626–27; engaged in a pattern of lying or other misconduct, *Dotson*, 202 F.R.D. at 575; and acted in bad faith, *Alexander*, 930 F. Supp. 2d at 961. Having reviewed Dunn's false testimony and the record as a whole, and relying on "[c]ommon sense and human experience," the Court concludes that Dunn's false representations were not inadvertently made. *Id.* at 952, 959.

First, Dunn's false testimony was not casually provided, nor did it represent a one-off episode. In May 2023, plaintiff filed a complaint—which Dunn reviewed before it was filed and confirmed its accuracy, *see* [85-1] at 96—claiming that each work in suit was a "wholly original expression[]." [1] ¶ 13. In September 2023, Dunn provided written interrogatory responses attesting to his authorship of all the scripts of the works in suit. [85-1] at 4–5. Dunn provided those responses after having the opportunity to research and review them. He specifically attested "under penalty of perjury that *based upon reasonable inquiry* the foregoing responses to interrogatories are true and correct to the best of my knowledge, information, and belief." *Id.* at 17 (emphasis added). Seven months later, in April 2024, during his first deposition, Dunn provided false testimony on the same topic. His testimony then was not limited

23

to a hasty response to a single question. Instead, for approximately 45 minutes—as defendants' counsel methodically compared scripts from the works in suit to materials that predated their creation—Dunn insisted that he had written the scripts himself and tried to cast doubt on the Wayback Machine's accuracy. *Id.* at 98–104.

The substance of Dunn's testimony further supports the Court's conclusion that he acted willfully. His testimony was not merely false; it was elaborately so. Dunn did not simply assert that he wrote the scripts. Instead, in his interrogatory responses, he detailed his research and the "substantive, authoritative" answers he pursued; the "numerous articles" he read to understand "key concepts and relationships" to craft a narrative; and the "conscious decisions" he made about what should be said and the "narrative arc[s]" he designed. [85-1] at 4–5. In his deposition, Dunn similarly spoke of the "tremendous amount of reading and research" he conducted to write the scripts and the arduous process of "distilling" this research into a script. [85-1] at 92, 95. Moreover, his answers conveyed a strong degree of conviction. He responded "absolutely" when asked whether Say It Visually claimed a copyright in the scripts themselves, adding: "[I]t's a lot of the work and a lot of creativity compressed into text." *Id.* at 95. And when confronted with identical text predating his videos, Dunn claimed repeatedly that there must be an error because he specifically remembered writing the scripts. *Id.* at 98. This level of detail and certitude highlights Dunn's willfulness.

For his part, Dunn attributes his false testimony to an "oversight and a failing of my memory." [75-1] ¶ 24. These are two different excuses, and neither is

24

persuasive.

In this context, "oversight" means "an inadvertent omission or error." *Oversight,* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/oversight. Perhaps Dunn means that when he was asked via interrogatories and in a deposition about his script-writing process, he unintentionally skipped over the fact that he copied at least 23 of his scripts, completely or nearly verbatim, from existing webpages. If that's the case, "[c]ommon sense and human experience" tell the Court otherwise. *See Alexander*, 930 F. Supp. 2d at 952. One would not "inadvertently" make such a crucial omission, multiple times, in writing and orally, represented by counsel, while under oath and responding to a series of probing questions. Indeed, when a party refuses to come clean after being confronted at a deposition, and leaves opposing counsel to "ferret ... out" the truth, other courts, too, have seen willfulness. *E.g.*, *id.* at 961 ("[E]ach plaintiff resisted admitting the truth when confronted with it at the depositions. Those attempted concealments are further evidence of the plaintiffs' bad faith.").

Dunn also argues that his "inadvertent error," i.e., his "oversight," "was the result of ... being ambushed with documents Defendants chose not to identify or disclose in response to a long outstanding FFS interrogatory." [102] at 6. But the Court cannot countenance an argument that a party-witness, when unexpectedly impeached at his deposition, may spend the next 45 minutes repeatedly lying due to the shock of the confrontation. This is especially true where the subject of the impeachment—the originality of the scripts—is central to the litigation.

25

Dunn's "failing … memory" explanation is similarly unavailing. Dunn did not copy merely one or two of the scripts. He has admitted copying at least 40 scripts, *see* [85-1] at 152, and defendants have presented evidence that Dunn copied even more. The frequency with which Dunn copied the scripts diminishes the likelihood that Dunn simply forgot that he did so. *See Alexander,* 930 F. Supp. 2d at 959 ("[M]emory and reflection could not account for saying something happened week in and week out when it did not."). Nor is the issue of the copying of the scripts a minor detail, susceptible to being forgotten. As just discussed, the scripts' originality is a core issue in this litigation. *See id.* ("Reflection and imprecise memory might be acceptable excuses in situations where discrepancies were minor, but they were not minor here."). The degree to which Dunn copied from existing materials undermines his faulty memory argument as well. Dunn did not just copy a word or phrase here or there; his plagiarism was far more extensive. *See generally* [84-1] and [84-2].[11]

Nor can the Court ignore Dunn's testimony that he has a "photographic memory," *see* [85-1] at 103, or his professed ability to recount purely "from memory" that "40-odd" of plaintiff's 250 total videos were copied from FAQs, with 20 FAQs covering federal topics and 21 or 22 FAQs covering "more generic real estate topics,"

---

[11] Plaintiff claims that Dunn alerted defendants to his faulty memory during his first deposition. *See* [101] at 7 (asserting that during his deposition, Dunn "recognized and admitted that he had forgotten that those particular scripts were based off FHA documents"); [100] at 11 (same); [102] at 7 ("Dunn recognized in his deposition that his recollection had been faulty."). He provides no citation to support these assertions. Nor did the Court locate in the provided transcripts any instance of Dunn admitting that he simply forgot that he copied scripts. The closest bit of transcript is Dunn's cryptic response, when asked whether he lied in his interrogatory response, that his "recollection was not the same." [85-1] at 107. But admitting that one's recollection is "not the same" is not akin to admitting that one's previous recollection was faulty. Nor is it akin to admitting to having forgotten something.

*see* [85-1] at 152. This testimony severely undermines Dunn's current protest that he simply forgot that he copied scripts. *See Ayoubi v. Dart*, 640 F. App'x 524, 528 (7th Cir. 2016) (when a plaintiff acted with "certitude" and implied his memory of the topic at hand was "normal," but then—when confronted with the falsity of his testimony— "professed to have overwhelming memory issues," the inconsistency constituted perjury); *Littler v. Martinez,* No. 216CV00472JMSDLP, 2020 WL 42776, at *17 (S.D. Ind. Jan. 3, 2020) (when a deponent is "unequivocal" in his testimony, but then professes a lack of memory when confronted with "undisputable evidence" of his testimony's falsity, the deponent displays a "lack of candor while under oath"). And if Dunn's false testimony were truly the result of a lapsed memory, "this raises the question of why counsel did not see fit to refresh [his] memory prior to his deposition under oath." *Life After Hate, Inc. v. Free Radicals Project, Inc.*, No. 18 C 6967, 2020 WL 5848429, at *5 (N.D. Ill. Oct. 1, 2020).

Finally, Dunn's willfulness is evident in the caginess with which he (and plaintiff) has addressed his false testimony after-the-fact. By the time defendants filed their motions for sanctions, months after Dunn's depositions, plaintiff had yet to produce the scripts' source material. [85] ¶ 11. (As far as the Court knows, that discovery request remains unfulfilled.) And in his latest sworn affidavit, Dunn continues to minimize the significance of his false testimony, describing his copying of scripts as being limited to only a "few videos." [75-1] ¶ 24. Dunn also points to the fact that he filed supplemental applications with the Register of Copyrights that disclaimed copyright in the scripts of 23 videos. *Id.* ¶25. But Dunn does not explain

why he filed supplemental applications for only 23 videos when he previously testified that "40-odd" were copied. [85-1] at 152. Indeed, in his carefully crafted affidavit, Dunn never explicitly declares that he copied *only* 23 scripts. If Dunn's false testimony really were the result of an honest mistake, this affidavit would be a good time to come clean. Dunn's failure to do so is further evidence of his bad faith and yet another sign that Dunn's false testimony was given willfully.

### B. Defendants Did Not Forfeit Their Argument That Dunn Committed Perjury.

Plaintiff makes a sort of forfeiture argument: that because defendants failed to plead "fraud on the Copyright Office" under 17 U.S.C. § 411(b) with the particularity required by Federal Rule of Civil Procedure 9(b), "the issue is not before the Court." [102] at 6. This argument is unavailing. Dunn's own perjury prevented defendants from learning of the extent of the potential copyright invalidity issue until months after they filed their responsive pleading. [85-1] at 7; [51]; [81] ¶ 10 (Dunn answered the interrogatories falsely claiming authorship of the scripts in September 2023; defendants filed their answer in December 2023; defendants discovered that scripts had been copied in April 2024). Plaintiff writes: "The Court is not psychic." [100] at 10. Well, neither are defendants. Plaintiff's position would permit a litigant to benefit from its perjury, so long as that perjury was not discovered until after the responsive pleadings were filed. [118] at 8.

In any case, defendants' sixth affirmative defense stated that "[p]laintiff's claims are barred by the doctrine of inequitable conduct, as the copyright registrations for the works at issue were obtained through material

misrepresentations to the Copyright Office." [51] at 17. Plaintiff never moved to strike this affirmative defense on any grounds, including for failure to plead fraud with particularity under Rule 9(b). Its attempt to do so now comes too late. *See United Nat. Records, Inc. v. MCA, Inc.,* 609 F. Supp. 33, 38–39 (N.D. Ill. 1984) ("A party who fails to raise a Rule 9(b) objection normally waives the requirement."); *Omans v. Manpower, Inc.,* No. 11 C 8178, 2012 WL 1565339, at *5 (N.D. Ill. May 2, 2012) ("Defendant did not move to dismiss this count on Rule 9 grounds, and Rule 9 objections are thereby waived.").

Finally, plaintiff twice states that "[d]efendants' Rule 36 admission moots the issue" of his false testimony, "as evidence that contradicts a standing admission must be ignored." [102] at 6. But plaintiff does not point to any case in which one party's uninformed admission excused another party's perjury. The Court has not found a case that stands for such a (remarkable) proposition either.

### C. Dismissal with Prejudice Is the Appropriate Penalty.

The Court next considers what sanctions to impose. The goals of sanctions for perjury are to "remedy prejudice to [the opposing] party," "reprimand the offender," and "deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.,* 579 F.3d 787, 797 (7th Cir. 2009) (quotations omitted). Though dismissal is a "particularly severe sanction," it is within the Court's discretion. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991); *see also White v. Williams*, 423 F. App'x 645, 646 (7th Cir. 2011) ("District judges have the inherent authority to impose sanctions—including dismissal—when a litigant engages in

conduct that abuses the judicial process.").

To dismiss a case for a party's perjury, the Court must find by a preponderance of the evidence that "the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776, 778 (7th Cir. 2016). As the Court has detailed already, Dunn's false testimony was not the result of inadvertence or mistake, but a repeated and ongoing attempt to avoid admitting falsity in his copyright registrations.

Dismissal is not appropriate if the perjury was harmless to the litigation. *Allen v. Chicago Transit Auth.,* 317 F.3d 696, 703 (7th Cir. 2003). For example, in *Phillips v. Kelley Chevy, LLC,* a district court found dismissal of plaintiff's entire Title VII action "overly harsh" where a plaintiff perjured himself in a "limited" manner that appeared relevant to only a small, severable portion of his damages. No. 1:21-CV-00118-SLC, 2022 WL 93379, at *6 (N.D. Ind. Jan. 7, 2022). But here, Dunn's perjury was not harmless: Though the full extent of Dunn's perjury is still unknown and unadmitted, it has infected at least 23 of the 100 works in suit (if not more). [75-1] ¶¶ 23, 24; [84] at 1; [84-1], [84-2] (providing evidence that plaintiff copied at least 47 of the scripts); [85-1] at 152 (Dunn admits to copying scripts for "40-odd" videos).

Nor is dismissal appropriate if the perjury was easily discovered. *Allen,* 317 F.3d at 703. But here, Dunn's perjury was found only through defendants' diligence, on the eve of Dunn's deposition. [81] ¶ 10; [118] at 8 n.1. And again, the full extent of Dunn's perjury is still unadmitted.

Dismissal may be appropriate if the plaintiff abused the judicial process by

seeking relief based on information it knows is false. *Ramirez*, 845 F.3d at 776; *see also Ayoubi*, 640 F. App'x at 528 ("[D]ismissal with prejudice is an appropriate sanction for lying to the court in order to receive a benefit from it."); *Martin v. DaimlerChrysler Corp.,* 251 F.3d 691, 694 (8th Cir. 2001) (dismissal appropriate where a plaintiff "willfully withheld information directly responsive to [defendant's] interrogatory and deposition questions").

To that end, Dunn's actions mirror those of the plaintiffs in *Alexander,* who lied about the "core" of one of their claims, resisted admitting the truth when confronted with it at depositions, failed to offer a plausible explanation for the differences between their testimony and declarations, and later attempted to withdraw the claim about which they lied. 930 F. Supp. 2d at 947, 957, 961. As in *Alexander,* Dunn lied about his authorship of the video scripts that formed a central component of this copyright dispute; resisted admitting the truth for nearly 45 minutes of questioning during his deposition; failed to offer a plausible (or even consistent) excuse for the discrepancy in his testimony; and subsequently sought to rectify the situation by retracting misrepresentations made to the Register of Copyrights. Presented with these circumstances, the court in *Alexander* felt dismissal with prejudice appropriate. So does this Court. *Alexander* explained:

> If it were otherwise—if it were the way the plaintiffs want it to be—litigants could lie about claims to the point of getting caught, then withdraw those claims with impunity. It would be well worth it to pursue a pattern of perjury because there would no risk, either civilly or criminally so long as the perjurer abandoned the claims intended to be supported by the perjurious testimony. Under the defendants' perverse view, the integrity of the judicial system can [be] compromised with the wrongdoer suffering no effective sanction.

31

*Id.* at 957. By sanctioning plaintiff through dismissal of this action, the Court can compensate defendants for the costs and burdens Dunn's perjury imposed upon them, deter plaintiff and Dunn from engaging in misconduct in other litigation, dissuade future would-be perjurers, and preserve the integrity of the judicial system and the copyright registration process. *See, e.g., Secrease*, 800 F.3d at 402 ("Courts generally have an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct.").

The Court recognizes that before dismissing a case with prejudice, it must consider whether other, less severe sanctions could still accomplish its objectives. *See Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999). Plaintiff makes this point as well but specifies no lesser, but still adequate, form of sanctions. [102] at 4.

The Court has considered sanctioning plaintiff by only excluding *some* of the works in suit from this case. *Cf.* Fed. R. Civ. P. 37(b)(2)(A)(ii). As an initial matter, though, the Court does not agree with plaintiff's blasé assessment that only a "few" of the works in suit have been compromised, such that the rest of the matter should go forward unimpeded. [74] at 7. The Court will not impose this lesser sanction for another reason as well: Dunn has failed to be forthright with defendants' counsel and the Court as to exactly how many of the scripts he copied. So the Court cannot reasonably limit its finding of perjury, and the accompanying sanction, to the 23 works for which Dunn submitted Correction Applications with the Register of Copyrights, *see* [75-1] ¶ 25, or the "40-odd" works that Dunn testified in his second deposition had unoriginal scripts, *see* [85-1] at 152. Furthermore, even if the affected

32

works in suit were identified with certainty and could be practically severed from the remaining case, the Court is still persuaded by *Alexander* to proceed with wholesale dismissal. As *Alexander* reasoned:

> [F]alsifying claims and then simply withdrawing them without consequence and proceeding apace with the balance of a suit creates a farcical situation. Allowing it to happen without consequence sets a poor precedent—a court must be mindful of its responsibility to deter future parties from trampling upon the integrity of the court.

930 F. Supp. 2d at 959. In other words, no litigant should ever feel free to risk committing perjury with the hope that, even if the lies are exposed, the rest of the case will progress unhindered.

Another possible sanction would be to order plaintiff to pay the attorneys' fees and costs that defendants incurred as a result of Dunn's perjury. *Cf.* Fed. R. Civ. P. 37(b)(2)(C). But in this Court's estimation, limiting plaintiff's sanction to payment of fees and costs would insufficiently punish Dunn, insufficiently lighten the unfair burden Dunn's perjury placed on defendants, and insufficiently preserve the integrity of the judicial system.

Dismissal without prejudice is a similarly inadequate remedy. Plaintiff had many opportunities to be forthright with defendants and this Court as to how many of the copyrighted works in suit had unoriginal scripts. It declined those opportunities. The Court has no reason to believe that, if given the chance to sue again, plaintiff would be honest about the scripts' origins. Nor should defendants be burdened by a second round of litigation.

Perjury, like Dunn's, is fraud on the Court, and under the right circumstances, "a litigant who defrauds the court should not be permitted to continue to press his case." *Allen,* 317 F.3d at 703. For the reasons set forth above, those circumstances exist here.

## IV.    Conclusion

Defendants' motion for sanctions is granted [83], and plaintiff's complaint [1] is dismissed with prejudice. The parties' competing motions for summary judgment, defendants' motion to withdraw its admission under Rule 36, and plaintiff's motion for Rule 37(e) sanctions are denied as moot. [73], [76], [78], [86]. Civil case terminated.

By April 10, 2025, the parties are directed to submit a proposed schedule for briefing on defendants' request that the Court award them attorneys' fees and costs under 17 U.S.C. § 505. [84] at 2. If there is a reasonable prospect that the parties can reach agreement on the issue of attorneys' fees and costs, they should use their briefing-schedule submission to inform the Court.

_____

Georgia N. Alexakis
United States District Judge

Date: March 27, 2025